Filed 1/22/14  In re Damian C. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re Damian C. et al., Persons Coming Under the Juvenile Court Law. | |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | B249974 (Los Angeles County Super. Ct. No. CK88432) |
| Plaintiff and Respondent, | |
| v. | |
| S.C. and M.D., | |
| Defendants and Appellants. | |

APPEAL from orders of the Superior Court of Los Angeles County, Philip L. Soto, Judge.  Affirmed.

David A. Hamilton, under appointment by the Court of Appeal, for Defendant and Appellant S.C.

Roni Keller, under appointment by the Court of Appeal, for Defendant and Appellant M.D.

John F. Krattli, Office of the County Counsel, James M. Owens, Assistant County Counsel and Navid Nakhjavani, Deputy County Counsel, for Plaintiff and Respondent.

Appellants M.D. (Mother) and S.C. (Father) appeal the orders denying their petitions for modification under Welfare and Institutions Code section 388 and the order terminating their parental rights under section 366.26.[1] Finding no error, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

The family came to the attention of the Department of Children and Family Services (DCFS) in June 2011 after a referral alleging physical abuse and domestic violence. Both parents submitted to an on-demand drug test and tested positive for amphetamines and methamphetamine. They admitted to using methamphetamine "every other day," and Father stated he had been using the drug "on and off" since 2003. Their three children, Damian (then 6), Nathan (then 5), and Ian (then 23 months), were detained and placed with their maternal grandparents, who lived next door.[2] The petition alleged, and the court found true at the August 2011 jurisdictional hearing, that Mother and Father had a history of engaging in physical altercations and had unresolved substance abuse issues, including current use of amphetamines and methamphetamine by both parents, and current use of marijuana by Father.[3]

---

[1]    Undesignated statutory references are to the Welfare and Institutions Code.

[2]    Damian, the only child old enough to be interviewed, reported that Mother and Father fought a lot, and that Father called Mother "bad names" and caused her to cry. He further reported that Father had thrown an object and broken a window, and that Nathan had almost stepped in the broken glass. Damian also stated that Father hit Mother and sometimes hit him on the back of the head, hurting him and making him cry. Damian was afraid of Father.

[3]    Mother and Father pled no contest to the petition after certain allegations, including allegations of physical abuse, were dismissed and the remaining allegations amended.

The reunification period lasted until September 2012. Immediately after the detention, Mother and Father were provided referral to substance abuse and domestic violence programs.[4] Both began to participate and made initial progress, completing parenting classes and nearly completing the six-month drug counseling program. Father completed half of the domestic violence program. Both parents tested negative for drugs. In September 2011, DCFS liberalized visitation, allowing both parents unmonitored day visits with the children. But in October 2011, Father was arrested for domestic violence and visitation reverted to monitored. In November, drug tests for both parents indicated the samples were diluted. In December 2011, Father tested positive for amphetamines and methamphetamine.

In the months prior to the September 2012, 12-month review hearing, Father repeatedly tested positive for amphetamines and methamphetamine (in January, February, March, July and August 2012), and regularly missed tests. Mother tested positive in March and August 2012. She also provided diluted samples on some occasions and missed some tests. Both parents had been temporarily suspended from their substance abuse programs in early 2012 for missing multiple sessions. In August 2012, Mother and Father appeared at the program apparently under the influence and were asked to test. After both parents tested positive, they stopped attending entirely. As of the date of the 12-month review hearing, Father had not completed the domestic violence program and Mother had not participated in individual counseling. At the September 19, 2012, 12-month review hearing,

---

[4]     At disposition, the court-ordered reunification plan required participation in parenting classes, a substance abuse program with aftercare and weekly testing for both parents, participation in individual counseling and a domestic violence support group for Mother, and participation in a 52-week domestic violence program for Father.

the court terminated the parents' reunification services and set the matter for a hearing pursuant to section 366.26.

Shortly after reunification services were terminated, there was another reported domestic violence incident. Father moved out of the apartment where the couple had been living (next door to the maternal grandparents and the children). Mother thereafter lost the apartment as she could not afford to live there on her own. After the move, Mother continued to visit the children regularly during the week. Father visited on weekends, when the children went to visit their paternal grandparents. In January 2013, the court continued the section 366.26 hearing to March 20 so that the home study for the prospective adoptive parents (the maternal grandparents) could be completed.[5]

In February 2013, Father submitted a petition for modification under section 388, seeking additional reunification services. Father presented evidence that he had been participating in a substance abuse program and a domestic violence program since October 2012.[6] The court set a hearing on the petition and ordered DCFS to prepare a supplemental report addressing it.

On March 19, 2013, one day before the scheduled section 366.26 hearing, Mother submitted a separate petition for modification seeking additional reunification services or for the children to be returned to her custody. Mother presented evidence that she had re-enrolled in the substance abuse program, which was also providing group therapy for anger management and domestic violence issues and individual counseling. She had repeatedly tested negative for drugs and alcohol between October 2012 and February 2013 and had not missed any tests or

---

[5]    The study was completed prior to the scheduled hearing.

[6]    After filing the petition, Father tested negative for illicit substances between February and May 2013.

4

program sessions. She stated that "the biological family deserve[d] a chance to be together again." The court continued the section 366.26 hearing, set a hearing on Mother's petition, and ordered DCFS to prepare a supplemental report addressing the petition.

DCFS recommended against granting Father's petition as he had not completed the 52-week domestic violence program in the two years that had elapsed since the detention, and Father's enrollment and participation in his earlier programs had been spotty and intermittent. In addition, it appeared that the drug treatment program in which he was enrolled was not DCFS approved, and Father had enrolled only because he had been ordered into a substance abuse program by a criminal court after being arrested in November 2012.[7]

The supplemental report stated that Mother's case manager reported she had been regularly attending classes for several months. In April 2013, while awaiting the hearing on her petition, Mother completed the substance abuse portion of the program and enrolled in the aftercare portion. DCFS recommended against granting Mother's petition, noting that "it ha[d] taken her almost two years to complete a six[-]month [substance abuse] program," and that there was no guarantee she would complete her aftercare program and continue to test clean if she were granted an additional six months of services. Moreover, although Mother had reported she was living with a maternal aunt, her relationship with Father was unclear.

---

[7] Subsequent evidence indicated the arrest was for a violation of Penal Code section 273.5, subdivision (a), inflicting corporal injury to a spouse or cohabitant.

In its final status report, DCFS continued to recommend termination of parental rights in order to free the children for adoption by the maternal grandparents. Their home study had been completed and approved.[8]

At the May 23, 2013 hearing on both parents' section 388 petitions, the court accepted stipulated testimony from Mother that she would complete the aftercare portion of her substance abuse program in the summer of 2013 and intended to continue individual counseling. Counsel for Mother asked that the children be returned to her based on her progress in the substance abuse program, representing that she had a stable home with a maternal aunt. Alternatively, counsel requested an additional six months of reunification services for Mother. Counsel for Father contended that his completion of the substance abuse program, consistent negative testing, and completion of more than half of the domestic violence program supported changed circumstances sufficient to support granting his petition for additional services. Counsel for the children joined in Mother's request.[9] The children's counsel pointed out that as the parents would continue to be an active part of the children's lives due to their placement with the maternal grandparents, it would be in the children's best interest for the parents to complete services. DCFS's counsel advocated denial of the petitions, noting the absence of a long-term period of sobriety outside of the substance abuse programs, the lack of recent testing at DCFS-approved centers, and Father's failure to complete the domestic

[8] The caseworker concluded termination of parental rights would not interfere with any bond between Mother and the children: "[That] bond . . . will always continue as [the maternal grandfather] is willing to have an open adoption and will continue to allow Mother to have a relationship with the children." The caseworker had similarly stated with respect to Father that "Father will continue to have visits with the children regardless of being granted more reunification services or not."

[9] Counsel for the children did not believe Father had presented sufficient evidence to support a finding of changed circumstances, but presumed he would receive additional services if the court granted Mother's petition.

violence counseling. DCFS's counsel pointed out that in the two years since detention, Mother and Father had been acting more as playmates than parents, and that the children had moved on with their lives under the care of their grandparents.

The court denied the parents' section 388 petitions. At the hearing, the court acknowledged that they "ha[d] done a lot of work" and that it was "difficult for people [who] have a lengthy and extensive drug history or domestic violence charges against them and to turn things around overnight." However, the court noted that even then -- two years after the children had come under DCFS jurisdiction -- neither the domestic violence classes nor the aftercare program had been completed. Moreover, in light of the parents' history, "[a]ny day for any reason something could trigger [them] to relapse and go back into drugs again." Although the parents were changing, "[t]he[] kids needed to have somebody that was changed way back when in the later part of 2011 or early 2012, not the middle of 2013 and not the end of 2013[,] which is what minor[s'] counsel is talking about in giving Mom and/or Mom and Dad six more months of services."

The court then asked the parties to address the section 366.26 issues. Mother's counsel introduced into evidence stipulated testimony that Mother visited the children several times per week, that they recognized her as their mother, and that during the visits, they participated in educational activities, such as homework. Mother's counsel pointed out that the two older children had lived with their parents the majority of their lives, that Mother had occupied a parental role during her visits, and that DCFS appeared to have acknowledged the existence of a bond with Mother when it reported that the grandparents would continue to permit visitation. Father's counsel also argued that the bond between the children and their parents was strong enough to outweigh the benefit of adoption. The children's counsel joined counsel for DCFS in urging the court to terminate parental rights to free the children for adoption by the maternal grandparents.

7

The court terminated parental rights.  At the hearing, the court stated: "[T]his is the hardest part for the same reasons we already addressed . . . .  You needed to get all of these things done two years ago so we could have avoided this.  That's why we try and give you all of the services up front and encourage you to get these things done up front and warn you that if you don't, you could not only lose the services, but lose your rights to be parents of the children, because they deserve and they need permanency.  We need to move on for adoption which is where we're going with this.  [¶] The court having read and considered the reports and admitting them into evidence will make the following findings and orders: we'll find that continued jurisdiction is necessary because conditions continue to exist which justify the court taking jurisdiction under [section] 300.  The court will find by clear and convincing evidence that the children are adoptable.  I find that it would be detrimental to the children to be returned to the parents and there is no exception to . . . . adoption applying in this case."  Mother and Father appealed.

## DISCUSSION

A.  *Section 388 Petitions*

Under section 388, a parent or other interested person may petition the court to change, modify or set aside a previous order on the grounds of changed circumstances or new evidence.  (§ 388, subd. (a).)  "The petitioner has the burden to show a change of circumstances or new evidence and [that] the proposed modification is in the child's best interests" or that "the child's welfare requires the modification sought."  (*In re B.D.* (2008) 159 Cal.App.4th 1218, 1228; see California Rules of Court, rule 5.570(h)(1).)  Appellate courts review the grant or denial of a petition for modification for abuse of discretion.  (*In re B.D.*, *supra*, at p. 1228.)  "In evaluating whether the petitioner has met his or her burden to show changed circumstances, the trial court should consider:  '(1) the seriousness of the

8

problem which led to the dependency, and the reason for any continuation of that problem; (2) the strength of relative bonds between the dependent children to both parent and caretakers; and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been.'" (*Id*. at p. 1229, italics omitted, quoting *In re Kimberly F*. (1997) 56 Cal.App.4th 519, 532.)

The changed circumstances requirement of section 388 "must be viewed in the context of the dependency proceedings as a whole. [Citation.]" (*In re Marilyn H*. (1993) 5 Cal.4th 295, 307.) "Once reunification services are ordered terminated, the focus shifts from reunification to the child's need for permanency and stability, and a section 366.26 hearing to select and implement a permanent plan must be [held]. . . . [¶] . . . The fact that the parent 'makes relatively last-minute (albeit genuine) changes' does not automatically tip the scale in the parent's favor." (*In re D.R*. (2011) 193 Cal.App.4th 1494, 1512, quoting *In re Kimberly F., supra,* 56 Cal.App.4th at p. 530.)

The juvenile court's finding that Mother's and Father's circumstances had not changed sufficiently to warrant returning the children or re-opening the reunification period was not outside the bounds of reason. Jurisdiction was the result of domestic violence perpetrated by Father and the parents' consistent abuse of dangerous and highly addictive drugs. Father's commitment to long-term change was suspect, as he had previously failed to comply with the terms of a drug treatment program and had re-enrolled in the current program to meet the requirements of a criminal court proceeding. He had never successfully completed the required domestic violence program. Both parents had continued abusing drugs well after DCFS took custody of their children. Both were still participating in substance abuse treatment programs at the time of the hearing on their petitions and had not shown they could maintain sobriety outside the confines of such

programs. Both had relapsed in the past after making initial progress. The children were very young and had already spent two years outside their parents' custody, growing accustomed to their new home. Given this evidence, the court could reasonably have concluded that although Mother and Father were making some progress in dealing with their substance abuse and anger management issues, they had not sufficiently changed to support returning the case to the reunification phase and delaying the children's permanent placement.

B. *Termination of Parental Rights*

Section 366.26, subdivision (c)(1) requires the juvenile court to terminate parental rights and order the dependent child placed for adoption if it finds by clear and convincing evidence that the child is likely to be adopted, unless it finds "a compelling reason for determining that termination would be detrimental to the child" due to the existence of specified exceptional circumstances. (See § 366.26, subd. (c)(1)(B).) Subdivision (c)(1)(B)(i) provides an exception to termination where "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."

There is no dispute that the children were likely to be adopted by their maternal grandparents with whom they had lived for nearly two years. Once the likelihood of adoptability is ascertained, the burden is on the parent to demonstrate that termination of parental rights to free the child for adoption would be detrimental to the child. (*In re T.S.* (2009) 175 Cal.App.4th 1031, 1039; *In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1343-1345.) "Because adoption is more secure and permanent than a legal guardianship or long-term foster care, adoption is the Legislature's first choice for a permanent plan for a dependent minor child who has not been returned to the custody of his or her parents and who is found by the dependency court to be adoptable." (*In re Scott B.* (2010) 188 Cal.App.4th

10

452, 469.) "[I]t is only in exceptional circumstances that a court will choose a permanent plan other than adoption." (*Ibid*.) We review the trial court's section 366.26 finding to determine whether substantial evidence supports it, construing the evidence most favorably to the prevailing party and indulging in all legitimate and reasonable inferences to uphold the court's ruling. (See *In re S.B.* (2008) 164 Cal.App.4th 289, 297-298; *In re Misako R.* (1991) 2 Cal.App.4th 538, 545.)[10]

The evidence established that the parents maintained regular visitation throughout the proceedings. The issue before the court was whether the termination would be "detrimental" because the children would "'benefit from continuing the relationship.'" That phrase has been interpreted to refer to a parent-

---

[10] We are aware that appellate courts have taken different positions on the appropriate standard of review. In *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351, the court applied an abuse of discretion standard. More recently, in *In re Bailey J.* (2010) 189 Cal.App.4th 1308, the court held that both the substantial evidence and abuse of discretion standards of review "come into play in evaluating a challenge to a juvenile court's determination as to whether the parental . . . relationship exception to adoption applies in a particular case." (*Id*. at p. 1314.) According to the court, the substantial evidence standard of review is applied to review of the juvenile court's determination as to the existence of a beneficial parental relationship. (*Ibid*.) The other component -- "the requirement that the juvenile court find that the existence of that relationship constitutes a 'compelling reason for determining that termination would be detrimental'" -- "calls for the juvenile court to determine the importance of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption. [Citation.]" (*Id*. at p. 1315, italics omitted.) In the court's view, that component of the juvenile court's decision is "a 'quintessentially' discretionary decision," and therefore, the abuse of discretion standard of review applies. (*Ibid*.) Mother contends that application of the *Bailey J*. hybrid standard of review creates a "third prong" to the two-part test of section 366.26, subdivision (c)(1)(B)(i), requiring parents to establish not just regular visitation and a beneficial relationship to support detriment, but also to establish a "'compelling reason'" for the court to conclude that termination would be detrimental. We do not agree that application of the abuse of discretion standard of review or hybrid standard of review would place an additional burden on the parents. Nevertheless, we apply the substantial evidence standard.

11

child relationship that "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Autumn H*. (1994) 27 Cal.App.4th 567, 575.) "In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Ibid*.) The existence of the section 366.26, subdivision (c)(1)(B)(i) exception must be determined "on a case-by-case basis, taking into account the many variables which affect a parent/child bond," such as, "[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs . . . ." (*In re Autumn H., supra,* 27 Cal.App.4th at p. 576.)

Here, the court found that it would be detrimental to the children to be returned to the parents and that none of the statutory exceptions applied. The finding is supported by substantial evidence. The children were very young -- 6, 4 and under 2 -- in June 2011 when they were detained, and by the time of the section 366.26 hearing, had been cared for by their grandparents for a substantial portion of their lives. In 2012, shortly after reunification services were terminated, Mother and Father moved away from the apartment complex where the children were living and ceased being a day-to-day fixture in their lives. The reports indicated that in 2011 and 2012, Damian expressed a desire to live with his parents because "we have fun and we play," but that he was also content to stay with his grandparents. No other evidence was presented that the children missed their parents, suffered from their absence or were unhappy in their placement. Thus,

12

there was no evidence that they would be "greatly harmed" by the loss of the relationship.

Mother contends that evidence established that she maintained a parental role in the lives of the minors because of the uncontested evidence she helped them with their homework. Counsel stipulated that Mother would testify to that effect. The court was not bound to give the stipulated testimony credence, especially where, as here, two of the children were pre-school when detained and the children were only 8, 6 and not yet 4 when the court terminated parental rights. In any event, there was no evidence Mother and Father cared for them in other essential ways, such as feeding or bathing them, taking them to medical appointments, or providing financial support. (See *In re Autumn H*., *supra*, 27 Cal.App.4th at p. 575 ["Interaction between natural parent and child will always confer some incidental benefit to the child. The significant attachment from child to parent [to support the exception] results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation."].)

Mother and Father contend that evidence of a significant bond was undisputed because in the supplemental reports addressing the petitions for modification, the caseworker responded to the parents' contentions that they and the children shared a bond by observing that the parents would continue to see the children due to the maternal grandparents' expressed willingness to allow parental visitation to continue. We do not view this as a concession on DCFS's part, but an acknowledgment that a relationship is likely to continue when the children are adopted by close family members.[11]

[11] Respondent suggests the grandparents' amenability to continued contact with the parents supported the trial court's decision to terminate parental rights. Where a beneficial parent/child bond is established by the evidence, the promise of prospective adoptive parents to continue to include the biological parents in the children's lives can
*(Fn. continued on next page.)*

13

Mother and Father contend the court applied an incorrect standard, relying on the statements made by the court prior to ruling on termination, quoted above. Specifically, they point to the court's statements that "[the parents] needed to get all of these things done two years ago so we could have avoided this" and "[t]hat's why we try and give you all of the services up front and encourage you to get these things done up front and warn you that if you don't, you could not only lose the services, but lose your rights to be parents of the children, because they deserve and they need permanency." The parents contend the court "relied on the criteria for a petition for modification, not the beneficial relationship exception" in making its ruling. We view the court's statements as an expression of regret that the parents did not turn their lives around in time to avoid reaching the termination stage. Nothing in the record indicates the court was unaware of or failed to apply the appropriate criteria.

---

have no bearing on the court's determination to sever parental rights. (*In re C.B.* (2010) 190 Cal.App.4th 102, 128-129 [juvenile court cannot "terminate parental rights based upon an unenforceable expectation that the prospective adoptive parents will voluntarily permit future contact between the child and a biological parent, even if substantial evidence supports that expectation"; court cannot "leave the protection of [a beneficial parent/child] relationship dependent upon the hoped-for goodwill of the prospective adoptive parents"]; accord, *In re S.B., supra,* 164 Cal.App.4th at p. 300.) We see nothing in the record to indicate that the juvenile court relied on the statements in the caseworker's reports about the grandparents' post-adoption intentions in making its ruling.

## DISPOSITION

The orders denying the section 388 petitions and terminating parental rights are affirmed.

### NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

MANELLA, J.

We concur:

EPSTEIN, P. J.

EDMON, J.*

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.